77 So.3d 254 (2012)
SUNSHINE STATE INSURANCE COMPANY, Appellant,
v.
Christopher JONES, Debra Watson-Jones, Nicho Watson, Michele Baldasti, by and through her mother and legal guardian, Stacy Baldasti, and Kayla Mineo, by and through her mother and legal guardian, Cheryl Mineo, and Geico General Insurance Company, Appellees.
No. 4D10-2723.
District Court of Appeal of Florida, Fourth District.
January 18, 2012.
*255 Steven G. Schwartz and David J. Pascuzzi of Schwartz & Horwitz, PLC, Boca Raton, for appellant.
James K. Clark of Clark, Robb, Mason, Coulombe & Buschman, Miami, for appellee, Geico General Insurance Company.
GROSS, J.
This declaratory judgment action pits Sunshine State Insurance Co., the issuer of a homeowner's policy, against Geico General Insurance Co., the issuer of an automobile insurance policy. Their dispute involves which one is liable for indemnity and defense of claims against a person they both insured. That person, a passenger in a car, grabbed the steering wheel. When the driver tried to get her passenger to stop being annoying, she lost control of *256 the car and it slammed into a concrete wall. The trial court determined that the passenger's actions did not constitute "use" of the car, so that Sunshine State's exclusion did not apply and it was responsible for indemnity and defense. We affirm.
The underlying lawsuit stems from an accident involving four teenagers and some horseplay. One Friday night, after a high school football game, Carley Moore was driving her parents' Toyota Corolla to a friend's house. In the front passenger seat was Nicho Watson, her boyfriend. Michele Baldasti and Kayla Mineo were in the backseat. Carley and Nicho were both seventeen; Michele and Kayla were a year younger.
During the drive, Nicho would reach over to beep the horn, as well as hold the steering wheel, to get a rise out of Carley. Even though Carley told Nicho to stop, he persisted. Keeping her left hand on the wheel, Carley tried to swat Nicho's hand away with her right hand. Nicho grabbed the wheel more than five, and probably more than ten, times; while Nicho himself never made the car swerve, the car swerved when Carley tried to swat Nicho away. As Carley was driving on an exit ramp, Nicho grabbed the wheel again; when Carley tried to push him away, she lost control of the car and its left side hit a concrete wall.
Through their parents, Michele and Kayla each filed a negligence suit against Carley and Nicho, also through their parents. Apparently, Carley settled Michele's and Kayla's claims against her, so that the action proceeded solely against Nicho. Sunshine State then filed a declaratory judgment action against Geico and others.
The aim of the declaratory judgment action was (1) to avoid liability for indemnity and the responsibility of providing a defense and (2) to pin those obligations on Geico. Sunshine State had issued a homeowner's insurance policy to Nicho's parents. Geico had issued an automobile insurance policy to Nicho and his mother, but denied both coverage and a defense.
Geico's auto insurance policy stated in its "Section ILiability Coverages," that it would pay for the following:
Under Section I, we will pay damages which an insured becomes legally obligated to pay because of:
1. bodily injury, sustained by a person, and
2. damage to or destruction of property,
arising out of the ownership, maintenance or use of the owned auto or a non-owned auto. We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim or suit.
(Emphasis in original.) With regard to a non-owned car, in describing the persons covered, the Geico policy also provided, in pertinent part:
Section I applies to the following with regard to a non-owned auto:

1. you and your relatives when driving the non-owned auto. Such use must be with the permission, or reasonably believed to be with the permission of the owner and within the scope of that permission.
(Emphasis in original.)
In Section II, Sunshine State's homeowner's policy provides for "COVERAGE EPersonal Liability." That section generally obligates Sunshine State to indemnify and defend its insured "[i]f a claim is made or a suit is brought against an `insured' for damages because of `bodily injury' or `property damage' caused by an `occurrence' to which this coverage applies." However, Section II provides for *257 the following motor vehicle exclusion, in pertinent part:
1. Coverage EPersonal Liability and Coverage FMedical Payments to Others do not apply to "bodily injury" or "property damage":
....
f. Arising out of:
(1) The ownership, maintenance, use, loading or unloading of motor vehicles or all other motorized land conveyances, including trailers, owned or operated by or rented or loaned to an "insured"[.]
Sunshine State argued that Nicho's alleged negligence, characterized as horseplay, constituted the use of an automobile, bringing it within the coverage of Geico's policy and within the auto use exclusion in Sunshine State's. Accordingly, Sunshine State asserted that it did not have a duty to defend or a duty to indemnify Nicho, and moved for summary judgment. In its own motion for summary judgment, Geico argued that Nicho's alleged negligence did not constitute use, so that the claim did not fall within its coverage.
Following a hearing on the cross-motions for summary judgment, the trial court issued a declaratory judgment in favor of Geico. Pointing to the facts, the court concluded that the claims at issue "did not arise out of Watson's use of the motor vehicle," and, also, that Nicho was not driving the non-owned auto. The court therefore found that Geico's policy did not provide coverage for the accident, and that Sunshine State's policy did, because Nicho's conduct did not fall within its auto use exclusion.
"Summary judgment is proper if there is no genuine issue of material fact and if the moving party is entitled to a judgment as a matter of law." Volusia Cnty. v. Aberdeen at Ormond Beach, L.P., 760 So.2d 126, 130 (Fla.2000) (citation omitted). Because it is a legal question, a trial court's grant of summary judgment is reviewed de novo. Id. Similarly, an interpretation of an insurance contract is a legal question reviewed de novo. Arias v. Affirmative Ins. Co., 944 So.2d 1195, 1197 (Fla. 4th DCA 2006). Like other contracts, a court should only resort to rules of construction in interpreting an insurance contract when the language is ambiguous; otherwise, it should apply the plain and unambiguous meaning of the policy's language. Id.
Florida courts have held that the critical language in the policies here at issue"arising out of the ownership, maintenance, or use of an automobile"is unambiguous.[1]See Am. Sur. & Cas. Co. v. Lake Jackson Pizza, Inc., 788 So.2d 1096, 1099-1100 (Fla. 1st DCA 2001); Alligator Enters., Inc. v. Gen. Agent's Ins. Co., 773 So.2d 94, 95 (Fla. 5th DCA 2000); Hagenv. Aetna Cas. & Sur. Co., 675 So.2d 963, 966 (Fla. 5th DCA 1996) (en banc); Cesarini v. Am. Druggist Ins. Co., 463 So.2d *258 451, 452 (Fla. 2d DCA 1985); Indiana Ins. Co. v. Winston, 377 So.2d 718, 719 (Fla. 4th DCA 1979); Nat'l Indem. Co. v. Corbo, 248 So.2d 238, 241 (Fla. 3d DCA 1971). The courts have consistently interpreted the language "arising out of" to be "words of much broader significance than `caused by', and have been said to mean `originating from', `having its origin in', `growing out of' or `flowing from', or in short, `incident to' or `having connection with' the use of the car." See, e.g., St. Paul Fire & Marine Ins. Co. v. Thomas, 273 So.2d 117, 120 (Fla. 4th DCA 1973) (citing, inter alia, Corbo, 248 So.2d at 241).
This case turns on whether Nicho's conduct constituted "use" of the Moore car; that is, whether it can be said the injuries arose from the use of the car. We hold that Nicho's grabbing of the steering wheel to annoy his girlfriend was not "use of ... a non-owned auto" within the meaning of the Geico policy. Rather, Nicho was engaged in teenage horseplay. Under the facts of this case, horseplay was not an "activity involved in the utilization of the covered vehicle in the manner intended or contemplated by the insured." Corbo, 248 So.2d at 240. Nothing in the record indicates that Nicho's grasping of the steering wheel altered the direction of the car. Unlike the church-owned van used to transport church members, including children, to and from group activities in Heritage Mutual Insurance Co. v. State Farm Mutual Automobile Insurance Co., 657 So.2d 925 (Fla. 1st DCA 1995), the Moore car was a compact four-door sedana private passenger car. In Corbo, children's horseplay was likely to occur; in this case, it was not. See id. at 927 ("[The van's] purpose was to transport church members, including children .... [Children] quickly become rambunctious when confined in a vehicle, and unlikely to sit quietly, with seat belts fastened. Such behavior would be even more likely after an outing....").
A second reason that the auto policy does not provide coverage here arises from the wording of the policy. The Moores' Toyota was a "non-owned auto" within the meaning of the auto policy Geico issued to Nicho's mother. That policy would provide coverage if Nicho's "driving" was "with the permission, or reasonably believed to be with the permission of the owner," the Moores. It is not reasonable to believe that Nicho's horseplay was in any way sanctioned by the Moores.
Thus, Nicho's conduct fell outside of both the coverage provided in Geico's auto policy and the exclusion in the Sunshine State homeowner's policy. The circuit court correctly determined that it was the homeowner's policy that provided coverage here.
This conclusion is supported by our decision in West American Insurance Co. v. Silverman, 378 So.2d 28 (Fla. 4th DCA 1979). As in the instant case, Silverman involved a dispute between a passenger's auto and homeowner's insurers as to which company had the duty to provide the passenger a defense. Id. at 29. While the driver and passenger were in the car, the passenger "grabb[ed] the driver's arm causing the car to go out of control resulting in [a] collision with the guard rail." Id. The passenger was killed. Id. His estate sued the driver and the driver's auto insurer; the driver counterclaimed, arguing the passenger caused the accident. Id. The passenger and the insurance companies fought over who was liable for defending against the driver's counterclaim. Id. The trial court found that the duty to defend rested with the passenger's homeowner's insurer, which appealed the ruling to this court. Id.
This court started by excerpting the relevant exclusion from the homeowner's policy *259 and relevant coverage from the auto policy, which are, in all material respects, the same as the provisions in this case. See id. at 30-31. It then framed the issue before it:
The crux of this case is whether the alleged grabbing of the driver's arm by a passenger with a resulting accident may be said to create liability arising out of the use of an automobile. If so, then coverage may arguably be under an auto liability policy. On the other hand, if the grabbing of the driver's arm by the passenger does not create liability arising out of the use of an automobile, then coverage and a duty to defend exists under the homeowner's policy of the passenger. This is so since the automobile policy expressly includes coverage for the "use of an automobile," and the homeowner's policy expressly excludes coverage for injury arising from the "use of an automobile." Clearly, these two standard policies are intended to be complementary and not overlapping. Of importance, then, is the distinction as to who was using the car; that is, the passenger or the driver under the alleged facts.
Id. at 31.
Ultimately, we held in Silverman "that the actions of the passenger in grabbing the arm of the driver are not such as give rise to liability arising out of the use of an automobile." Id. at 32. Thus, "the policy exclusion within the homeowner's policy was not applicable" and "[t]he passenger's homeowner's policy should thus provide the defense of the counterclaim." Id. The grabbing of the wheel in this case is conduct similar to the grabbing of the driver's arm in Silverman. Both actions interfered with the driver's use and operation of the car; neither action was an attempt by the passenger to employ the car in a manner intended or contemplated by the insured or to exert control over the operation of the car.
Contrary to Sunshine State's argument, the decision in Race v. Nationwide Mutual Fire Insurance Co., 542 So.2d 347, 347 (Fla.1989), did not abrogate Silverman. The issue in Race was whether an insured husband and wife could recover under their auto insurance policy's uninsured motorist coverage "for injuries received from an uninsured motorist's intentional assault at the scene of a prior automobile accident." Id. at 347. The Court concluded that the term "arising out of the ownership, maintenance, or use" of a motor vehicle "as contained in a UM policy should be given the same interpretation as that language is construed in automobile liability policies." Id. at 349. The Court held that there was no coverage under the UM policy, reasoning that the "most that can be said is that the driving of the uninsured motorist which caused the accident created an atmosphere of hostility between the parties. It had nothing to do with [the assault victim's] injuries, which only came about several minutes later when [the uninsured motorist] thought [the victim] was reaching for a gun." Id. at 351.
Race did not change the law in Florida; rather, it confirmed the standard already applied by the district courts in applying the phrase "arising out of the ownership, maintenance, or use of an auto." See Allstate Ins. Co. v. Safer, 317 F.Supp.2d 1345, 1357 (M.D.Fla.2004) (observing that Race "did not overrule the majority standard set forth in earlier case law"). For example, both Race and Silverman cited with approval an earlier case out of this court, St. Paul Fire & Marine Insurance Co. v. Thomas, 273 So.2d 117 (Fla. 4th DCA 1973), which set out that standard. See Race, 542 So.2d at 350 (quoting with approval Watson v. Watson, 326 So.2d 48, 49 (Fla. 2d DCA 1976) (citing Thomas)); Silverman, *260 378 So.2d at 31 (discussing Thomas). And, insofar as Race concerned the application of policy language to an intentional tort, it is of little help in analyzing the negligent horseplay in this case.
For these reasons, we affirm the summary final judgment of the circuit court.
POLEN, J., concurs.
CONNER, J., concurs specially with opinion.
CONNER, J., concurring specially.
I agree with the majority that Nicho's horseplay could not be considered use of a non-owned car with permission, but I disagree with the majority that his horseplay did not constitute "use" of the car. In my view, his horseplay rose to a level to which it can be said he was co-driving the car with Carley.
An automobile is a transportation device used to travel from Point A to Point B by a combination of controlling a steering wheel, a gas pedal, and a brake. Although one normally thinks of a vehicle being driven by one driver at a time, any person who exerts physical control, either singularly or in combination, over the steering wheel, the gas pedal, or the brake pedal can be said to be involved in "driving" the vehicle, if the vehicle is moving at the time. Thus, if two people are physically controlling the steering wheel at the time the vehicle is moving, both are exerting control over the movement of the vehicle and should be considered as "driving" and "using" the vehicle in the context of what is insured by an automobile policy. I also contend my view of what is meant by "driving" and "use" of a vehicle is consistent with subsection 324.021(3), Florida Statutes (2007), which defines an operator of a motor vehicle under the financial responsibility law as "[e]very person who is in actual physical control of a motor vehicle."
My view of what constitutes driving also comes from dictionary definitions. One of the definitions of "driver" is "a person who steers and propels a vehicle." Black's Law Dictionary 533 (8th ed. 2004). Webster's Ninth New Collegiate Dictionary defines the verb "drive" as "to operate the mechanism and controls and direct the course of." Webster's Ninth New Collegiate Dictionary 384 (1990 ed). Black's Law Dictionary also defines "driving" as "of the act of directing the course of something, such as an automobile...." Black's Law Dictionary 533 (8th ed. 2004).
The majority and the appellee place considerable reliance on our decision in West American v. Silverman, 378 So.2d 28 (Fla. 4th DCA 1979). The negligent conduct in Silverman was a passenger pulling on the arm of the driver while the driver was driving, causing the driver to lose control of the vehicle, which killed the passenger.
As the majority points out, in Silverman we said, "Of importance, then, is the distinction as to who was using the car; that is, the passenger or the driver under the alleged facts." Id. at 31. The complaint in Silverman alleged "the Decedent, Bruce Silverman, grabbed hold of and pushed and/or pulled on the arms of the Counterclaimant wherein the Decedent, Bruce Silverman, took control of said vehicle causing said vehicle to go out of control and collide with a guardrail and overpass," and "[t]he Decedent, Bruce Silverman, so negligently and carelessly took control of said vehicle that it was taken from the control of the Counterclaimant causing said vehicle to collide with a guardrail and overpass." Id. at 30. We also said "[i]t is a close question" as to whether the homeowner's policy or the automobile policy should provide a defense. Id. at 32. Immediately after stating "[i]t is a close question," *261 we launched into a public policy discussion as to which insurance policy should control, and stated, "We stress that the instant fact situation does not present a question as to an injured third party," and suggested that if a third party had been hit, our ruling would be that the automobile policy would cover the situation. Id. However, because the situation in Silverman "is more confined and limited to a consideration of the conduct between the driver and his passenger," because there were issues of comparative negligence between the driver and the passenger, and because we felt there were "somewhat inconsistent precedents," we concluded "the actions of the passenger in grabbing the arm of the driver are not such as to give rise to liability arising out of the use of an automobile" for purposes of which policy had to provide a defense. Id. Footnote 1 of the opinion made it clear that we did not decide which policy might ultimately be responsible for payment of the claim.[2]Id. at 32 n. 1.
I submit it is important to note a point made in the concurring opinion in Silverman by Associate Judge Baker. He pointed out that in affirming the trial judge, the appellate court was agreeing with the trial court's construction of the language in the complaint that Silverman "took control" of the vehicle as "nothing more than, `The passenger negligently and carelessly caused the driver to lose control of the vehicle.'" Id. at 33 (Baker, Associate Judge, concurring). Judge Baker went on to point out:
The phrase, "took control", in the context of the counterclaim, is not sufficient to establish an intentional, purposeful act by the passenger to exercise control over the vehicle, that is, to "use" the vehicle. If it were sufficient, the duty to defend on the counterclaim would be that of the passenger's automobile liability carrier under the reasoning of Judge Beranek's opinion.
Id.
A close reading of Silverman also suggests that both the driver and the passenger had been drinking prior to the crash. Although the facts of the case are not stated in detail in the opinion, it is likely the factual scenario in Silverman is that the intoxicated passenger was grabbing the intoxicated driver's arm either as horseplay or to get the driver's attention during a friendly discussion or an argument, without any intention to affect the steering of the vehicle. If that was the case, it is entirely logical to hold the homeowner's policy should provide a defense. But as the concurring opinion points out, if the passenger was intending to control the steering of the vehicle by grabbing the driver's arm, then the auto policy should provide the defense.
In this case, it appears the horseplay was intentionally directed to affect the steering of the vehicle. Although there is no evidence that Nicho's grabbing of the steering wheel caused the vehicle to swerve, that makes no difference because his actions show he was intending to exert physical control over the steering of the vehicle, even if it was to have the vehicle continue on a straight path. Because his actions were intended to physically control the steering of the vehicle as it was transporting the occupants, I contend he was "using" and jointly "driving" the vehicle. Therefore, I believe the trial court erred in finding Nicho did not "use" or "drive" the vehicle in its Final Declaratory Judgment.
*262 However, I would affirm the trial court because the language of the auto policy limits coverage for driving non-owned vehicles to situations in which the "use of . . . a non-owned auto" (driving) is "with the permission of the owner and within the scope of that permission." Appellee is correct that "[i]t seems difficult to understand how [Nicho's] horseplay would constitute `driving the non-owned auto' with `the permission, or reasonably believed to be with the permission of the owner and within the scope of that permission.'" As noted by the majority, courts have required that homeowner's policies and auto policies be construed to leave no gap in coverage. Since Nicho's "use" of the vehicle was not a "use of . . . a non-owned auto" with permission as required by the auto policy, the trial court correctly determined the coverage should be under the homeowner's policy.
NOTES
[1] These holdingswhich lead to the same meaning whether the language appears in a coverage or an exclusionare consistent with the principle that a homeowner's policy "should be construed as leaving no gap in coverage between it and an automobile policy." Farrer v. U.S. Fid. & Guar. Co., 809 So.2d 85, 94 (Fla. 4th DCA 2002). An auto policy "protects [the] insured for liability arising out of the use of that vehicle, while the [homeowner's policy] excludes coverage arising from the use of the vehicle." Id. Thus, "[t]he interpretation of the clauses should be complementary." Id. at 95; see also 8A Couch on Insurance § 119:26 n.22 (3d. ed. 1997) ("Where a coverage clause in an automobile liability policy and an exclusionary clause in a homeowners' policy employ identical language, they should be construed identically in order to avoid the possibility that some occurrence could escape coverage under both policies.").
[2] In the body of the opinion we specifically stated, "Whether such a legal obligation to pay is within the coverage of any particular policy is a question which may not yet be determined." Id. at 32.